YURMAN DESIGN, INC., Plaintiff–
Appellee–Cross–Appellant,

v.

PAJ, INC., doing business as Prime Art
& Jewel, Defendant–Appellant–
Cross–Appellee.

Nos. 00–7765(L), 00–7805(XAP).

United States Court of Appeals,
Second Circuit.

Argued Feb. 28, 2001.

Decided Aug. 10, 2001.

Maxim H. Waldbaum; Salans, Hertzfeld, Heilbronn, Christy & Viener, New York, NY, (Lori D. Greendorfer, on the brief), for Plaintiff–Appellee–Cross–Appellant.

Peter T. Cobrin, Cobrin & Gittes, New York, NY, (Oren J. Warshavsky, on the brief), for Defendant–Appellant–Cross–Appellee.

Before JACOBS, STRAUB, and POOLER, Circuit Judges.

JACOBS, Circuit Judge:

Defendant PAJ, Inc. ("PAJ") appeals from a judgment entered by the United States District Court for the Southern District of New York (Sweet, *J.*), following a jury verdict that found PAJ liable to plaintiff Yurman Design, Inc. ("Yurman") on

claims of (1) copyright infringement, (2) trade dress infringement under the Lanham Act, and (3) unfair competition under New York law—all of these claims arising out of PAJ's manufacture and sale of jewelry featuring the use of twisted, multistrand cable together with other design elements, including gemstones. Yurman cross-appeals post-trial rulings by the district court (1) refusing to award attorneys' fees on the Lanham Act claim, and (2) vacating the jury's award of punitive damages on the state law unfair competition claim.

On the appeal, we affirm the judgment as to the copyright claims but reverse as to the Lanham Act and state law unfair competition claims. That resolution moots the cross-appeal.

### BACKGROUND

Yurman, a firm based in New York City, has been designing, manufacturing and marketing fine jewelry since approximately 1982. Its president and founder, David Yurman, has made the firm famous for its lines of twisted cable pieces. The firm markets its jewelry products under the brand name DAVID YURMAN®.

PAJ, founded in 1978, is a smaller jewelry company based in Dallas, Texas. PAJ entered the cable jewelry market in 1998. In the fall of that year, Yurman advised PAJ in a letter that PAJ was producing and selling a line of costume jewelry that copied Yurman designs, and demanded that PAJ cease and desist. PAJ failed to respond to the cease and desist letter by a two-week deadline, and Yurman filed this suit alleging copyright, Lanham Act, and state law unfair competition violations. As to the copyright claims, Yurman charged that PAJ had infringed five Yurman copy-

rights in earring and bracelet designs by marketing five jewelry pieces with substantially similar designs. Yurman also alleged that a single trade dress was discernible in its five copyrighted designs as well as in 13 other Yurman bracelets, earrings and rings, and that 21 PAJ pieces violated the Lanham Act because their similarities to this trade dress were likely to cause confusion concerning the jewelry's source. Finally, Yurman alleged that PAJ violated New York's unfair competition law because the trade dress violation was committed in bad faith and caused actual confusion among consumers.

On November 1, 1999, following a seven day trial, the jury returned a special verdict largely favorable to Yurman. On the copyright claims, the panel concluded that four PAJ products infringed four Yurman copyrighted designs. As to copyright damages, the Copyright Act affords a plaintiff the option of seeking either actual damages suffered plus profits earned by the infringer or "statutory damages." 17 U.S.C. § 504. Yurman elected to seek statutory damages, which at the time allowed an award of up to $100,000 per work infringed if the violation was willful, or up to $20,000 per work if it was not. *See* 17 U.S.C.A. §§ 504(c)(1)-(2) (West 1996 & Supp.1999).[1] The jury found that PAJ had infringed each of Yurman's four copyrights willfully, and awarded a total $275,000. By way of injunctive relief for those copyright violations, Judge Sweet prohibited PAJ from manufacturing or selling its four infringing products, and ordered the company to destroy all infringing pieces within its control. *See Yurman Design v. PAJ, Inc.*, 93 F.Supp.2d 449, 466 (S.D.N.Y.2000).

On the Lanham Act claim, the jury found that Yurman's trade dress was distinctive as to the jewelry's source, and that

---

**1.** For actions brought on or after December 9, 1999, those limits are $150,000 and $30,000.

*See* 17 U.S.C.A. § 504(c)(1)-(2) (West Supp. 2001).

twenty PAJ bracelets, earrings and rings infringed the trade dress because they were likely to cause confusion concerning the source of PAJ's jewelry. Because the panel further found that PAJ violated Yurman's trade dress in bad faith, and actually caused confusion in the minds of consumers, the jury also found that PAJ violated New York's unfair competition law. Although the jury declined to require PAJ to disgorge any profits it made in connection with the trade dress and unfair competition violations, the panel did award Yurman $800,000 in punitive damages based on the state law claim.

The district court, in considering Yurman's request for equitable relief on the trade dress and state law claims, identified a hole in Yurman's case that it found problematic, and that we conclude is fatal: "try as it might, the Court [could not] divine precisely what [Yurman's] specific trade dress was." *Yurman Design*, 93 F.Supp.2d at 466. Recognizing that Yurman's "inability to articulate the trade dress" posed "significant problems, for the Court in issuing an injunction," Judge Sweet devised what he called an "imperfect solution." *Id.* The injunction bars PAJ from manufacturing or selling its 20 infringing products, and orders the company to destroy all infringing pieces within its control. *See id.* at 466.

After the verdict, PAJ moved for judgment as a matter of law under Rule 50(b) on each of the claims and to set aside the jury's damages determinations. In a published opinion, the district court declined to disturb any of the liability findings, or the award of statutory damages on the copyright claims, but did vacate the state law punitive damages award. *See id.* at 455–63.

Yurman cross-moved for attorneys' fees under the Copyright Act and the Lanham Act. Judge Sweet granted an award of fees

on the copyright claims but denied an award on the Lanham Act claim. *See id.* at 463–65.

## DISCUSSION

PAJ's appeal chiefly concerns the district court's denial of its Rule 50(b) motion for judgment notwithstanding the verdict on all of the jury's liability determinations. In light of our disposition of that appeal, we need not consider Yurman's cross-appeal regarding attorneys' fees and punitive damages.

 We review the denial of a Rule 50 motion *de novo*. *See Diesel v.. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir.2000). The motion may not be granted unless "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." *This is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir.1998) (internal quotation marks omitted). This standard will be met "[o]nly if there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against" the moving party. *Diesel*, 232 F.3d at 103.

We consider, in order, PAJ's challenges to the judgment under the Copyright Act, the Lanham Act and New York's unfair competition law.

## I

### A. Copyright Liability

 To prevail on a claim of copyright infringement, the plaintiff must demon-

strate both (1) ownership of a valid copyright and (2) infringement of the copyright by the defendant. *See Hamil America, Inc. v. GFI*, 193 F.3d 92, 98 (2d Cir.1999). PAJ argues that Yurman failed to establish either element with respect to any of Yurman's four claims of infringement, and further, that Yurman's copyrights are invalid under the "merger doctrine." We disagree with all of these contentions.

### 1. Validity of the Copyrights

■ Under the Constitution and by statute, copyright validity depends upon originality. *See Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345–47, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); U.S. Const. art. I, § 8, cl. 8 (authorizing Congress to "promote the Progress of . . . useful Arts, by securing for limited Times to Authors . . . the exclusive Right to their respective Writings"); 17 U.S.C. § 102. "Originality" in this context "means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." *Feist Publications, Inc.*, 499 U.S. at 345, 111 S.Ct. 1282. The "requisite level of creativity is extremely low; even a slight amount will suffice." *Id.*

■ Because all four Yurman designs at issue are registered in the United States Register of Copyrights, there is a statutory presumption that the copyrights are valid. *See Hamil America*, 193 F.3d at 98; 17 U.S.C. § 410(c). PAJ, which bears the burden of proving the invalidity of a registered copyright, *see Hamil America*, 193 F.3d at 98, was required to show that there was "such an overwhelming amount of evidence" of nonoriginality "that reasonable and fair minded men could not" have

found the four Yurman designs to be original. *Diesel*, 232 F.3d at 103 (internal quotation marks omitted); *see Granite Computer Leasing Corp. v. Travelers Indem. Co.*, 894 F.2d 547, 551 (2d Cir.1990) ("A verdict should be directed [in favor of the party with the burden of proof] only if the evidence in favor of the movant is so overwhelming that the jury could rationally reach no other result.").

Yurman's four copyrighted bracelets and earrings consist of "silver, gold, cable twist, and cabochon cut colored stones." [2] Appellee's Brief at 19. Yurman of course concedes that none of those constituent elements, considered alone, is original. What Yurman seeks to protect by copyright is the "artistic combination and integration of these common elements," *i.e.*, the particular way in which the elements "are placed, balanced and harmonized" in the four designs. *Id.* at 18–19.

■ Copyright law may protect a combination of elements that are unoriginal in themselves. With respect to compilations of facts, for example, protection extends to choices of "selection and arrangement, so long as they are made independently by the compiler and entail a minimal degree of creativity." *Feist Publications*, 499 U.S. at 348, 111 S.Ct. 1282. The same principles apply to "derivative work[s]," which are "based upon one or more preexisting works." 17 U.S.C. § 101. Jewelry designs have been viewed as fitting within this latter category. *See Diamond Direct, LLC v. Star Diamond Group*, 116 F.Supp.2d 525, 529 (S.D.N.Y. 2000) (Kaplan, *J.*) (considering the originality of diamond ring designs). In either case, however, the copyright "extends only to the material contributed by the author

---

**2.** The designs are designated as "Yurman B4973" (Copyrt. Reg. No. VA 643–194) "Yurman B4977" (Copyrt. Reg. No. VA 785– 335) "Yurman E4973" (Copyrt. Reg. No. VA 785–334), and "Yurman B4809" (Copyrt. Reg. No. VAu 254–365).

of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." 17 U.S.C. § 103(b); *see Feist Publications*, 499 U.S. at 348, 111 S.Ct. 1282 ("[C]opyright protection [in a factual compilation] extend[s] only to those components of a work that are original to the author.").

▉ To rebut the presumption that Yurman's four designs are original, PAJ offered evidence that some other companies make jewelry that includes twisted cable as a design element, and that some of those jewelry pieces also include gemstones and other elements found in Yurman's products. This showing misses the point, however: the originality in Yurman's four designs inheres in the ways Yurman has recast and arranged those constituent elements. We have carefully reviewed the cable jewelry produced by third parties that PAJ submitted to the jury, and cannot conclude that any of Yurman's four combinations are nonoriginal as a matter of law.

## 2. Copyright Infringement

▉ To establish infringement, the copyright owner must demonstrate that "(1) the defendant has actually copied the plaintiff's work; *and* (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." *Hamil America*, 193 F.3d at 99 (internal quotations omitted).

▉ Under the Copyright Act, one may market a product identical to a copyrighted work so long as the second comer designed his product independently. *See Feist Publications*, 499 U.S. at 345–46, 111 S.Ct. 1282 ("Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the

result of copying."). PAJ concedes that it based its four pieces in part on the Yurman designs, but it offers the qualification that it learned—only later—that the designs it innocently copied had been copyrighted by Yurman. This concession is sufficient to satisfy the "actual copying" element, and the qualification is ineffective to rebut it. *See Procter & Gamble Co. v. Colgate–Palmolive Co.*, 199 F.3d 74, 77 (2d Cir.1999) (per curiam) (" 'innocent' copying is still copying" under copyright law).

While PAJ admits that it did not independently create its designs, it contends nevertheless that the similarities between its products and Yurman's are not sufficiently "substantial" to trigger liability. PAJ's "substantial similarity" argument raises a threshold issue as to our standard of review. PAJ cites a line of our cases to support the proposition that review of "substantial similarity" under copyright law is *de novo*. In each such case, however, we were reviewing judgments entered after a bench trial, and we departed from the "clearly erroneous" standard normally applicable to a trial judge's factual findings, Fed. R. Civ. Pro. 52(a), "because what is required is only a visual comparison of the works, rather than credibility, which we are in as good a position to decide as was the district court." *Folio Impressions, Inc. v. Byer California*, 937 F.2d 759, 766 (2d Cir.1991); *see Hamil America*, 193 F.3d at 97 (same). *Cf. Concord Fabrics, Inc. v. Marcus Bros. Textile Corp.*, 409 F.2d 1315, 1317 (2d Cir.1969) (per curiam) ("[A]s no part of the decision below turned on credibility, we are in as good a position to determine the question as is the district court."). However, we have never decided the standard of review applicable to *jury* findings of substantial similarity where credibility is not at issue. *See Segrets, Inc. v. Gillman Knitwear Co.*, 207 F.3d 56, 63 (1st Cir.2000) ("We have

found no Second Circuit cases applying [its judge-made *de novo* ] standard to a finding of substantial similarity by a jury.").

■■■■■ Although a jury's factual findings are subject to "independent review" where such review is constitutionally required, *Bose Corp. v. Consumers Union,* 466 U.S. 485, 501, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (First Amendment), we think that in copyright cases the Constitution dictates a more deferential standard. The Supreme Court's holding in *Feltner* was that "the Seventh Amendment provides a right to a jury trial on *all issues* pertinent to an award of statutory damages under § 504(c) of the Copyright Act, including the amount itself." *Feltner,* 523 U.S. at 355, 118 S.Ct. 1279 (emphasis added). Because *de novo* review of "substantial similarity" could have the effect of impairing that Seventh Amendment right, we hold that a jury's findings as to "substantial similarity" are subject to the same deferential review under Rule 50 that applies to other jury findings.

■■■■■ The standard test for substantial similarity between two items is whether an " 'ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard [the] aesthetic appeal as the same.' " [3] *Hamil America,* 193 F.3d at 100 (quoting *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir.1960) (L.Hand, J.)). If "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work," then the two products are substantially similar. *Hamil America,* 193 F.3d at 100;

*see Knitwaves, Inc. v. Lollytogs, Ltd.,* 71 F.3d 996, 1003 (2nd Cir.1995). The factfinder must examine the works for their " 'total concept and feel.' " *Hamil America,* 193 F.3d at 102 (quoting *Knitwaves,* 71 F.3d at 1002).

■■■■■ Applying the ordinary observer test, the jury separately found that the four PAJ designs were "substantially similar" to the four Yurman copyrighted pieces. Although PAJ is able to cite several "differences in detail" in each comparison, a finding of substantial similarity is not precluded where differences in detail "do little to lessen a viewer's overwhelming impression" that the defendant's products are "appropriations." *Knitwaves,* 71 F.3d at 1004; *accord Hamil America,* 193 F.3d at 102. Applying our own "good eyes and common sense" to each of the comparisons, *Hamil America,* 193 F.3d at 102, we are unable to say that the jury's conclusions were "the result of sheer surmise and conjecture." *Diesel,* 232 F.3d at 103.

### 3. The Merger Doctrine

■■■ By statute, copyrights protect the particular means of *expressing* ideas, not the ideas themselves. *See* 17 U.S.C. § 102(b). So if there is just one way to express an idea, the idea and expression are said to merge, and the expression is not protectable. *See Hart v. Dan Chase Taxidermy Supply Co.,* 86 F.3d 320, 322 (2d Cir.1996) ("[T]he merger inquiry asks whether all realistic fish mannequins, no matter how artistic they might be, will necessarily be 'substantially similar.' And

---

**3.** This is known as the "ordinary observer test." PAJ argues that the district court should have applied a more demanding "discerning ordinary observer test," which "requires the court to eliminate the unprotectible elements from its consideration and to ask whether the protectible elements, standing alone, are substantially similar." *Hamil*

*America,* 193 F.3d at 101 (citing *Folio Impressions,* 937 F.2d at 765–66). PAJ waived this argument by not objecting to the jury instructions. *See Yurman,* 93 F.Supp.2d at 459; Fed. R. Civ. Pro. 51 ("No party may assign as error the ... failure to give an instruction unless that party objects thereto before the jury retires to consider its verdict....").

only if this is so, is there no unique expression to protect under the copyright laws."); *CCC Info. Servs., Inc. v. Maclean Hunter Mkt. Reports, Inc.,* 44 F.3d 61, 68 (2d Cir.1994). The test is whether "protection of expression would inevitably accord protection to an idea." *CCC Info. Servs.,* 44 F.3d at 72 n. 26.

PAJ's brief contends that Yurman is trying to protect the idea of "using cable design (which is in the public domain), with gemstones (also in [the] public domain), in one or more combinations (also in [the] public domain)." Appellant's Brief at 59. At least as to Yurman's copyright claims (as opposed to its trade dress claims), PAJ's assertion is simply wrong. Yurman's position on the copyright claims is that its designs, which express original *combinations* of unprotectable elements, were infringed by four very similar-looking PAJ designs; Yurman's copyright claims do not seek protection for the idea of combining twisted cable and gemstones.

## B. Copyright Damages

■ As explained above, the Copyright Act allows plaintiffs to sue for "statutory damages" in lieu of "actual damages and profits." 17 U.S.C. § 504(c). Yurman elected statutory damages, which ranged (at the time) between $500 and $20,000 per work infringed, and up to $100,000 per work if the infringement was willful. *See* 17 U.S.C.A. §§ 504(c)(1)-(2) (West 1996 & Supp.1999).[4] The jury found that each of PAJ's four infringements was willful, and awarded a total of $275,000. PAJ argues that the willfulness finding is unsustainable, and in the alternative that it is excessive. We consider these two arguments in order.

■ Willfulness in this context means that the defendant "recklessly disregarded" the possibility that "its conduct represented infringement." *Hamil America,* 193 F.3d at 97; *see Knitwaves,* 71 F.3d at 1010 ("Reckless disregard of the copyright holder's rights ... suffices to warrant award of the enhanced damages."). A plaintiff is not required to show that the defendant "had knowledge that its actions constitute[d] an infringement." *Knitwaves,* 71 F.3d at 1010 (internal quotation marks omitted).

■ We review the jury's findings of willfulness under the same deferential Rule 50 standard that applies to factual determinations pertinent to liability. *Cf. Hamil America,* 193 F.3d at 97 (reviewing a trial judge's willfulness finding for clear error). Under that deferential standard of review, we cannot disturb the jury's willfulness findings.

Viewed in the light most favorable to Yurman, the evidence at trial disclosed the following facts. At a meeting in September 1997, PAJ's chief executive officer, Felix Chen, met with a buyer for Zales Corporation to discuss the possibility that PAJ would make jewelry for Zales. The Zales buyer, Carrie Beckerich, provided PAJ with certain cable jewelry samples (the "Samples") and asked whether PAJ could manufacture jewelry products based on the Samples. Beckerich explained that she had obtained the Samples from an Italian manufacturer, Menegatti.

In fact, the Menegatti designs—the Samples—were based on copyrighted Yurman pieces that Beckerich had earlier provided to Menegatti. Beckerich did not tell PAJ the pedigree of the Samples, but she did mention David Yurman's name to PAJ representatives. PAJ requested nothing

---

4. As explained in note 1, *supra,* these statutory ranges are different for actions brought on or after December 9, 1999. *See* 17 U.S.C.A. § 504(c)(1)-(2) (West Supp.2001).

in writing concerning the origin of the Samples, made no inquiry concerning the background of Menegatti, and made no investigation of any kind.

Based on the Samples, PAJ produced a number of jewelry pieces for Zales. In December 1997, Zales returned the PAJ products, explaining that Zales would only be buying cable jewelry from Yurman, and that the PAJ designs were similar. As Chen testified:

Q: [The Zales buyer] also mentioned to you that she was returning the merchandise to you because it was similar; don't you recall you said that?

A: Yes. It means cable jewelry.

Q: She said it was similar, didn't she?

A: She probably said that.

The jury could infer from the return of the goods, and the explanation for it, that PAJ was warned of the potential similarity of the goods and should have taken appropriate steps to check for copyright infringement. Instead, without any investigation of intellectual property issues, PAJ embarked on a heavy advertising program to market the designs under its own label.

PAJ testified that it was unaware of Yurman's copyrights. But the jury was free to discredit that testimony, or to find that PAJ's ignorance was due to recklessness. *See Hamil America*, 193 F.3d at 97 (requiring "particular deference to determinations regarding witness credibility" when reviewing a willfulness determination); *accord Knitwaves*, 71 F.3d at 1010. PAJ's Chen, the man who had final decision-making authority over PAJ's conduct in this case, has been in the jewelry business for 23 years, and has had intellectual property counsel for over twelve years. He attends many of the major jewelry industry trade shows, and knew about Yurman's cable jewelry designs at all relevant times. *Cf. N.A.S. Import, Corp. v.. Chenson Enters.*, 968 F.2d 250, 253 (2d Cir.1992) (similarity of buckle design, in conjunction with close proximity of plaintiff's and defendant's stores, strongly supported finding of knowing appropriation); *Fitzgerald Pub'g Co. v. Baylor Pub'g Co.*, 807 F.2d 1110, 1115 (2d Cir.1986) (defendant's position as an experienced publisher treated as a circumstance supporting a finding that defendant had constructive knowledge of its infringement).

This evidence—PAJ's receipt of the copyrighted designs, its knowledge of Yurman's product line, and its failure to investigate the possibility of intellectual property violations after Zales returned the jewelry—provided a sufficient basis for an inference by the jury that the infringements were willful.

■ Because the jury found that PAJ infringed each of the four Yurman copyrights willfully, the Copyright Act permitted the panel to award between $500 and $100,000 "in its discretion." 17 U.S.C. § 504(c)(2); *see D.C. Comics, Inc. v. Mini Gift Shop*, 912 F.2d 29, 34 (2d Cir.1990) ("the court's discretion and sense of justice are controlling" (internal quotation marks omitted)). Although this is our first opportunity to review an award of statutory damages assessed by a jury, we see no reason to apply a less deferential standard than the standard we use to review calculations by a trial judge.

■ The jury's combined award of $275,000 amounts to $68,750 per work infringed, which is within the statutory range. Given the jury's sustainable finding of willfulness, we decline to alter the remedy. PAJ challenges the award chiefly on the ground that it bears little relationship to the $19,000 in profits PAJ claimed to have earned on the jewelry at issue in this case. But even if PAJ's accounting is correct, statutory damages are not meant to be merely compensatory or restitution-

ary. *See N.A.S. Import,* 968 F.2d at 252. The statutory award is also meant "to discourage wrongful conduct." *Id.* That is why the statute permits consideration of $80,000 in additional damages where an infringement is willful.

## II

 Yurman argued to the jury that its trade dress could be discerned from an entire product line of 18 different Yurman pieces—eight rings, seven bracelets, and three pairs of earrings. The overall impression conveyed by the Yurman designs that are alleged to embody Yurman's trade dress is a structural, almost industrial motif of twisted multi-strand cable, executed with a polished and elegant finish, and set off by gemstones. We need not decide whether these design elements are protectable as trade dress, or whether the overall impression can be expanded upon, because as the district court observed, Yurman itself has never identified the elements that make up its trade dress. We hold for the reasons that follow that this failure to articulate the dress required dismissal of the Lanham Act claim as a matter of law.

Section 45 of the Lanham Act defines "trademark" as "any word, name, symbol, or device, or any combination thereof [used or intended to be used] to identify and distinguish [a producer's] goods ... from those manufactured or sold by others and to indicate the source of the goods...." 15 U.S.C. § 1127. The owner of a trademark may apply to register it by filing *inter alia* "a drawing of the mark" in the United States Patent and Trademark Office. Lanham Act § 1(a)(1)(B), 15 U.S.C. § 1051(a)(1)(B). Among other privileges, registration of a mark "enables the owner to sue an infringer under § 32, 15 U.S.C. § 1114," and "entitles the owner to a presumption that its mark is valid, *see* § 7(b),

15 U.S.C. § 1057(b)." *Wal-Mart Stores v. Samara Bros.,* 529 U.S. 205, 209, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000).

Yurman has not registered what it seeks to protect as a trademark in this case, so it is proceeding under § 43(a) of the Lanham Act, which prohibits a person from using "any word, term, name, symbol, or device, or any combination thereof" that is "likely to cause confusion ... as to the origin, sponsorship, or approval of his or her goods." 15 U.S.C. § 1125(a).

 Although § 43 proscribes "a broader range of practices" than does the cause of action for infringement of registered marks, "the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)." *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992). Accordingly, both § 2 and § 43(a) have been construed to embrace not just source-identifying "word marks, such as 'Nike,' and symbol marks, such as Nike's 'swoosh' symbol, but also 'trade dress.'" *Samara Bros.,* 529 U.S. at 209, 120 S.Ct. 1339. Trade dress "originally included only the packaging, or 'dressing,' of a product," but it has been expanded to encompass what is at issue in this case: the design or configuration of the product itself. *Id.*

 We exercise "particular 'caution,' when extending protection to product designs." *Landscape Forms, Inc. v. Columbia Cascade Co.,* 113 F.3d 373, 380 (2d Cir.1997) (quoting *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 32 (2d Cir.1995)). Although the Lanham Act protects marks that "consumers are likely to rely upon in distinguishing goods," *Landscape Forms,* 113 F.3d at 380, "almost invariably, even the most unusual of

product designs such as a cocktail shaker shaped like a penguin-is intended not to identify the source" of the product, "but to render the product itself more useful or more appealing," *Samara Bros.*, 529 U.S. at 213, 120 S.Ct. 1339. *See Restatement (Third) of Unfair Competition* § 16 cmt.b at 159 (1995) ("Product designs are more likely to be seen merely as utilitarian or ornamental aspects of the goods."). And trade dress claims raise a potent risk that relief will impermissibly afford a level of "protection that would hamper efforts to market competitive goods." *Landscape Forms*, 113 F.3d at 380; *see id.* at 379 ("[T]he Lanham Act must be construed in the light of a strong federal policy in favor of vigorously competitive markets."); *Jeffrey Milstein*, 58 F.3d at 33. While most trademarks only create a monopoly in a word, a phrase, or a symbol, "granting trade dress protection to an ordinary product design would create a monopoly in the goods themselves." *Landscape Forms*, 113 F.3d at 380.

■■■■ A plaintiff asserting trade dress rights in the design of a product is therefore required to surmount additional hurdles. In any action under § 43(a), the plaintiff must prove (1) that the mark is distinctive as to the source of the good, and (2) that there is a likelihood of confusion between its good and the defendant's. *See Samara Bros.*, 529 U.S. at 210, 120 S.Ct. 1339. Where the mark is a word, symbol or even product packaging, the plaintiff may prove distinctiveness by showing *either* that the "intrinsic nature" of the mark serves to identify a particular source (what is known as "inherent distinctiveness") *or* that "in the minds of the public, the primary significance of [the mark] is to identify the source of the product rather than the product itself" (what is known as "acquired distinctiveness" or "secondary meaning"). *Id.* at 210–11, 120

S.Ct. 1339. The product design plaintiff, however, must always make the second, more difficult showing. *See id.* at 213–14, 120 S.Ct. 1339 ("Consumers should not be deprived of the benefits of competition with regard to the utilitarian and esthetic purposes that product design ordinarily serves by a rule of law that facilitates plausible threats of suit against new entrants based upon alleged inherent distinctiveness.").

■■■■ Moreover, even a showing of secondary meaning is insufficient to protect product designs that are overbroad or "generic"—"those that 'refe[r] to the genus of which the particular product is a species'." *Jeffrey Milstein*, 58 F.3d at 32, 33 (quoting *Two Pesos*, 505 U.S. at 768, 112 S.Ct. 2753). This check on monopoly rights limits all marks, but for two reasons it is particularly important in cases of product design. "[F]irst, 'overextension of trade dress protection can undermine restrictions in copyright and patent law that are designed to avoid monopolization of products and ideas.'" *Landscape Forms*, 113 F.3d at 380 (quoting *Jeffrey Milstein*, 58 F.3d at 32). Patent and copyright law bestow limited periods of protection, but trademark rights can be forever. *See Stormy Clime Ltd. v. ProGroup, Inc.*, 809 F.2d 971, 977–78 (2d Cir.1987). " '[S]econd, just as copyright law does not protect ideas but only their concrete expression, neither does trade dress law protect an idea, a concept, or a generalized type of appearance.'" *Landscape Forms*, 113 F.3d at 380 (quoting *Jeffrey Milstein*, 58 F.3d at 32;) *cf. Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 349–50, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991) (noting that the distinction between ideas and expression in copyright law "assures authors the right to their original expression, but encourages others to build freely upon the ideas and information conveyed by a

work"). Product design is driven primarily by the usefulness or aesthetic appeal of the object; trade dress protection for product design therefore entails a greater risk of impinging on ideas as compared with protection of packaging or labeling.

■■■■ A final doctrinal hurdle is the congressionally-imposed requirement that a plaintiff prove that an unregistered trade dress is "not functional." *See* Trademark Amendments Act of 1999 § 5, Pub.L. 106–43 (August 5, 1999), *codified at* 15 U.S.C.A. § 1125(a)(3) (West Supp.2001). (Prior to the congressional directive, this element was an affirmative defense in this circuit. *See, e.g., Jeffrey Milstein,* 58 F.3d at 31.) " '[A] product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.' " *TrafFix Devices, Inc. v. Marketing Displays, Inc.,* 532 U.S. 23, ——, 121 S.Ct. 1255, 1261, 149 L.Ed.2d 164 (2001) (quoting *Qualitex Co. v. Jacobson Prods. Co.,* 514 U.S. 159, 165, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995)) (other internal quotation marks omitted). And in cases involving an aesthetic feature, the dress is also functional if the right to use it exclusively " 'would put competitors at a significant non-reputation-related disadvantage.' " *TrafFix Devices,* 121 S.Ct. at 1261 (quoting *Qualitex Co.,* 514 U.S. at 165, 115 S.Ct. 1300). Thus, the nonfunctionality requirement "protects competition even at the cost of potential consumer confusion." [5] *Landscape Forms,* 113 F.3d at 379–380.

■■■■ The test of nonfunctionality in trade dress claims that are based on product design is even more critical than in trade dress claims based on packaging,

because a monopoly right in the design of the product itself is more likely to preclude competition. *See Restatement (Third) of Unfair Competition* § 16 cmt.b at 159 ("[T]he competitive interest in copying product designs is more substantial than in the case of packaging, containers, labels, and related subject matter."). As with the overbreadth element, "[r]igorous application" of the requirement of nonfunctionality is necessary "to avoid undermining the carefully circumscribed statutory regimes for the protection of useful and ornamental designs under federal patent and copyright law." *Id.* § 16 cmt.b at 158.

■■■ A plaintiff such as Yurman may seek trade dress protection for an entire product line, by establishing that the "overall look" in each separate product is "consistent." *Walt Disney Co. v. Good-Times Home Video Corp.,* 830 F.Supp. 762, 766 (S.D.N.Y.1993). But for obvious reasons, concern for protecting competition is in that context particularly "acute." *Landscape Forms,* 113 F.3d at 380; *see id.* ("[A] claim of trade dress covering an array of items is likely to be broader than one for an individual product's design.").

■■■ For the reasons stated below, we hold that a plaintiff seeking to protect its trade dress in a line of products must articulate the design elements that compose the trade dress. Although we announced the articulation requirement in the context of whether a plaintiff had satisfied the test for "inherent distinctiveness"—which is no longer at issue in product design cases—we think it applies with equal or greater force to any case in which a plaintiff seeks protection for a line of products. It is too easy for the question of design and configuration ("overall look") to

---

**5.** The nonfunctionality requirement substantially overlaps with the prohibition on overbroad marks discussed above. Both princi-

ples ensure that a trademark right does not unduly stifle competition.

degenerate into a question of quality, or beauty, or cachet. Thus, the "focus on the overall look of a product [or products] does not permit a plaintiff to dispense with *an articulation of the specific elements* which comprise its distinct dress." *Landscape Forms,* 113 F.3d at 381 (emphasis added).

First, without a specification of the design features that compose the trade dress, different jurors viewing the same line of products may conceive the trade dress in terms of different elements and features, so that the verdict may be based on inconsistent findings.

Second, no juror can evaluate secondary meaning, overbreadth, or nonfunctionality without knowing precisely what the plaintiff is trying to protect: "[w]ithout such a precise expression of the character and scope of the claimed trade dress, ... courts will be unable to evaluate how unique and unexpected the design elements are in the relevant market." *Landscape Forms,* 113 F.3d at 381.

Third, "a plaintiff's inability to explain to a court exactly which aspects of its product design(s) merit protection may indicate that its claim is pitched at an improper level of generality, *i.e.,* the claimant seeks protection for an unprotectible style, theme or idea." *Landscape Forms,* 113 F.3d at 381. The identification of design elements that compose the asserted trade dress will thus assist in winnowing out claims that are overbroad as a matter of law. *See Jeffrey Milstein,* 58 F.3d at 33 ("The level of generality *at which a trade dress is described,* as well as the fact that a similar trade dress is already being used by manufacturers of other kinds of products, may indicate that the dress is no more than a concept or idea to be applied to particular products.") (emphasis added). We would not have been able to decide whether the trade dress claimed in *Jeffrey Milstein* was generic if the plaintiff had

not proffered a description of what he sought to protect. *See id.* at 29, 33 (finding overbroad a trade dress asserted by a greeting card company and described as glossy "photographs die cut to the shapes of the objects depicted on the cards" with blank interiors, wrapped in a cellophane package).

Fourth, "[c]ourts will ... be unable to shape narrowly-tailored relief if they do not know what distinctive combination of ingredients deserves protection." *Landscape Forms,* 113 F.3d at 381. This case is itself a good example. *See Yurman Design,* 93 F.Supp.2d at 466 (Yurman's "inability to articulate the trade dress ... poses significant problems for the Court in issuing an injunction"). And if a court is unable to identify what types of designs will infringe a trade dress, how is a competitor in the jewelry business to know what *new* designs would be subject to challenge by Yurman? *See Samara Bros.,* 529 U.S. at 214, 120 S.Ct. 1339 (noting that "[c]ompetition is deterred ... not merely by successful suit but by the plausible threat of a successful suit").

We need not decide whether Yurman could formulate a description of design elements to support a trade dress claim sufficient to protect a line of Yurman jewelry, because Yurman has not even offered one for our consideration. The trade dress of works that are decorative or artistic may be harder to capture in words, and may need descriptions more broadly framed, or may need drawings; but the party seeking protection must nonetheless be able to point to the elements and features that distinguish its trade dress. Pressed by PAJ on appeal to provide some description of its trade dress, Yurman produced the following: "the artistic combination of cable [jewelry] with other elements." Appellee's Brief 33. But the word "artistic" simply begs a question; and unless Yurman seeks protection for

cable itself, the jewelry must be supposed to combine cable "with other elements." This articulation is altogether too broad to be a protectable, source-identifying expression. *Cf. Jeffrey Milstein,* 58 F.3d at 33 (concluding that "a trade dress described as consisting solely of die-cut photographs would simply 'refe[r] to the genus of which the particular product is a species.'" (quoting *Two Pesos,* 505 U.S. at 768, 112 S.Ct. 2753)). Yurman's inability to articulate its trade dress at a lower level of generality is not altogether surprising, given (1) that there are 18 different Yurman pieces in the product line it seeks to protect (eight rings, seven bracelets, and three pairs of earrings), four of which the jury found to be separately copyrightable; and (2) Yurman's concession that the pieces are composed exclusively of elements commonly used in the jewelry industry. Appellee's Brief at 17–19. A unique combination of elements may make a dress distinctive, but "the fact that a trade dress is composed entirely of commonly used or functional elements might suggest that the dress should be regarded as unprotectible or 'generic,' to avoid tying up a product or marketing idea." *Jeffrey Milstein,* 58 F.3d at 32.

Because Yurman failed to identify the specific elements of its trade dress, *see Yurman Design v. PAJ, Inc.,* 93 F.Supp.2d 449, 466 (S.D.N.Y.2000) (noting that Yurman failed "to articulate the trade dress"), PAJ's motion for judgment as a matter of law should have been granted. In sum, we hold that a plaintiff asserting that a trade dress protects an entire line of different products must articulate the specific common elements sought to be protected. Accordingly, we reverse the judgment against PAJ on the Lanham Act claim.

### III

The district court construed Yurman's state law unfair competition claim as re-

quiring (among other elements) that the firm succeed on its trade dress claim. *See* Trial Tr. 1116 ("For Yurman to succeed on the New York State claim ... it has the burden of establishing ... that it had a protected trade dress claim"); *Yurman Design v. PAJ, Inc.,* 93 F.Supp.2d 449, 462–63 (S.D.N.Y.2000) (Yurman's state law claim "virtually tracked its Lanham Act claim"). Yurman did not challenge that jury instruction (and does not question it on appeal). Therefore, our reversal of the judgment against PAJ on the trade dress claim requires reversal of the judgment against PAJ on the unfair competition claim.

### CONCLUSION

We affirm the judgment of liability and damages on the copyright claims; we reverse the judgment on the trade dress claim and on the state law unfair competition claim. Our disposition of the trade dress and unfair competition claims moots the cross-appeal, which only concerned attorneys' fees and damages on those claims. Each party shall bear its own costs on this appeal.