**NATIONAL LIGHTING COMPANY, INC., Plaintiff,**

v.

**BRIDGE METAL INDUSTRIES, LLC, Joseph Messa, Galaxy Switchgear Industries, LLC; Blaise Fredella, Isak Lemberg, Boris Bregman, Picasso Lighting Industries LLC, Independent Lighting, LLC, Green Light Solutions and Mitchell Bloomberg, Defendants.**

**No. 08 Civ. 3150(NRB).**

United States District Court, S.D. New York.

March 4, 2009.

Erwin J. Shustak, Esq., Shustak Frost & Partners, P.C., New York, NY, for Plaintiff.

Jill Levi, Esq., Todd & Levi, LLP, New York, NY, Sean Mack, Esq., Pashman Stein, Hackensack, NJ, for Defendants.

## MEMORANDUM and ORDER

NAOMI REICE BUCHWALD, District Judge.

Plaintiff National Lighting Company, Inc. ("National Lighting" or "National") commenced this action by filing a complaint ("Complaint" or "Compl.") on March 28, 2008. Thereafter, National filed an amended complaint ("Amended Complaint" or "Am. Compl.") on May 22, 2008, asserting the following claims, five of which are federal claims under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and nine of which are New York state law claims:

(1) trade dress infringement under the Lanham Act;

(2) false designation of origin under the Lanham Act;

(3) reverse palming off under the Lanham Act;

(4) false advertising and labeling under the Lanham Act;

(5) unfair competition under the Lanham Act;

(6) breach of contract;

(7) breach of implied covenant of good faith and fair dealing;

(8) state law reverse palming off;

(9) state law false advertising and labeling;

(10) state law unfair competition;

(11) deceptive trade practices;

(12) unjust enrichment and imposition of constructive trust;

(13) tortious interference with contractual relations; and

(14) tortious interference with prospective economic relations.

Defendants have moved to dismiss plaintiff's claims under Fed.R.Civ.P. 12(b)(6). For the reasons set forth below, we dismiss the five federal claims with prejudice as to all defendants and dismiss the nine state law claims without prejudice to reconsideration if plaintiff's counsel represents to this Court by March 25, 2009 that it intends to litigate in this forum its status under New York Business Corporation Law § 1312.

## FACTS [1]

Plaintiff National Lighting is a New Jersey corporation that is "engaged in the business of manufacturing and designing fluorescent lighting fixtures for installation in commercial offices, educational facilities and government buildings." Am. Compl. ¶¶ 4, 18. In late 2004 or early 2005, representatives of National met with defendants Joseph Messa, Blaise Fredella, Isak Lemberg and Boris Bregman to assess whether National could save money by using defendants Bridge Metal Industries, LLC ("Bridge") and Galaxy Switchgear Industries, LLC ("Galaxy") to manufacture its lighting fixtures.[2] Am. Compl. ¶ 19.

After months of negotiations, on or around July 28, 2005 National agreed to use Bridge/Galaxy for the manufacturing and assembly of "National lighting fixtures, housings and other parts to be incorporated into National lighting fixtures." Am. Compl. ¶ 20. Because National "was concerned that it be able to protect all of its technical know-how," it required

Bridge/Galaxy as part of this arrangement to sign a confidentiality agreement (the "Confidentiality Agreement"), which was signed by Messa and Fredella. Am. Compl. ¶¶ 19, 33; Am. Compl. Ex. A. National saw an even brighter future for its relationship with Bridge/Galaxy, as it was "considering a merger transaction ... with Galaxy and Bridge." Am. Compl. ¶ 31.

In the months that followed, National alleges that it provided the Bridge Defendants with (1) confidential information including drawings, formulas, designs, specification sheets, instructions for assembly and fixture samples; (2) support from National's employees and representatives to instruct them on manufacturing techniques; (3) information regarding where to purchase parts; and (4) contact information for National's clients. Am. Compl. ¶¶ 34, 35. Relying on the Confidentiality Agreement, "National essentially taught [the Bridge Defendants] the entire business of designing, manufacturing and engineering National lighting fixtures." Am. Compl. ¶ 35.

After months of assessing its relationship with the Bridge Defendants, however, National "decided against the potential merger" and, in or around 2006, made it clear to the Bridge Defendants "that the potential merger would not be consummated." Am. Compl. ¶¶ 36, 37. National continued to use Bridge/Galaxy to manufacture National fixtures for some time but claims that it discovered in late 2007 that the Bridge Defendants "had breached the [Confidentiality Agreement] and, in con-

---

**1.** The following facts have been drawn from the Amended Complaint, In considering these motions to dismiss, we accept as true the facts alleged in the Amended Complaint, *Bolt Elec., Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir.1995), and draw all reasonable inferences in favor of plaintiff, *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 216 (2d Cir.2004).

**2.** Plaintiff alleges that Bridge and Galaxy are alter egos of one another (collectively, "Bridge/Galaxy"), that Messa is the President of Bridge and Galaxy, and that Fredella, Lemberg and Bregman are each officers, directors and employees of Bridge and Galaxy. Am. Compl. ¶¶ 7, 8, 9, 10, 53. The "Bridge Defendants" will refer to Bridge, Galaxy, Messa, Fredella, Lemberg and Bregman.

cert with the other named Defendants, had purloined and stolen for their own use and benefit and were using National's designs, technical know-how, drawing and other intellectual property . . . to manufacture and market their own fixtures." Am. Compl. ¶¶ 21, 36. National alleges that it learned in late 2007 that "instead of destroying or returning [confidential information], the Bridge Defendants . . . [were using it] without National's permission." Am. Compl. ¶ 38.

According to National, the Bridge Defendants had constructed a showroom for Bridge/Galaxy and were marketing fixtures to the public from that showroom. Am. Compl. ¶ 39, 40. Thus, "while still manufacturing National fixtures for National, and without National's knowledge, consent or acquiescence, the Bridge Defendants secretly used the same molds, tools, dies, photographs, drawings, specifications, photometrics, technical know how and other intellectual property imparted to them by National and manufactured *additional* National lighting fixtures for their own use and benefit." Plaintiff's Supplemental Submission[3] dated February 4, 2009 ("Pl.'s Supp. Sub.") ¶ 23 (emphasis in original). When National's President visited the showroom posing as a buyer, defendant Lemberg allegedly told him that "Defendants could and would manufacture lighting fixtures identical to those set forth in the [National] specification sheets." Am. Compl. ¶ 40.

National alleges that, using this scheme, "Defendants . . . have sold to at least one third party products they tout as identical to National's without National's permission or approval." Am. Compl. ¶ 48. National maintains that the "Defendants continue to act in concert to manufacture, market and sell fixtures" in this manner. Am. Compl. ¶ 21.

## DISCUSSION

### I. Trade Dress Infringement

■ National maintains that defendants' conduct constitutes infringement of the trade dress of National's fluorescent lighting fixture line under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). Am. Compl. ¶ 56. For the reasons that follow, we find that plaintiff has not stated a claim for trade dress infringement and dismiss this claim as to all defendants.

The Second Circuit has enunciated the four pleading requirements for a claim of trade dress infringement involving the appearance of a product under section 43(a) of the Lanham Act: (1) plaintiff must allege "the claimed trade dress is non-functional;" (2) plaintiff must allege "the claimed trade dress has secondary meaning;" (3) plaintiff must allege "there is a

**3.** At oral argument on January 30, 2009, plaintiff claimed that, at the same time that defendants were manufacturing light fixtures for plaintiff, defendants were manufacturing extra fixtures to sell to customers on the side at a lower price. Oral Argument Transcript ("Tr.") 23:25–24:12. Because the Amended Complaint was vague as to how precisely defendants were alleged to be marketing the fixtures and because plaintiff claimed that this detail was unavailable at the time of filing, this Court permitted plaintiff to submit additional paragraphs on the narrow question of whether defendants were manufacturing extra fixtures for sale on the side *while* they were manufacturing fixtures for plaintiff. Letter from Judge Buchwald to Plaintiff's Counsel dated Feb. 2, 2009 at 1 ("I wish to give you the opportunity to submit one or more paragraphs on this—and only this—point"). Plaintiff took the liberty of submitting eight additional pages of allegations, some of which address the question at issue and some of which address behavior *after* the manufacturing relationship had ended. We accept the relevant paragraphs, paragraphs 21–24 in the Supplemental Submission, but ignore the extraneous material plaintiff sought to introduce without leave.

likelihood of confusion between the plaintiff's good and the defendant's;" and (4) plaintiff must "offer 'a precise expression of the character and scope of the claimed trade dress.'" *Sherwood 48 Assoc. v. Sony Corp. of America,* No. 02–9100, 2003 WL 22229422, at *2 (2d Cir. Sept. 29, 2003)(citing *Yurman Design, Inc. v. PAJ, Inc.,* 262 F.3d 101, 115–16 (2d Cir.2001) and quoting *Landscape Forms, Inc. v. Columbia Cascade Co.,* 113 F.3d 373, 381 (2d Cir.1997)). We dismiss plaintiff's claim of trade dress infringement because plaintiff has not offered "a precise expression of the character and scope of the claimed trade dress" under *Sherwood* and *Landscape Forms.*

Before we consider the sufficiency of plaintiff's trade dress description, we first note that courts have been reluctant to extend trade dress protection to a product's design (as opposed to its packaging) and to an entire line of products (as opposed to a single product). Plaintiff's claimed trade dress involves product design *and* covers an entire product line.

The *Landscape Forms* court explained why courts are particularly cautious in assessing product design trade dress claims:

> The policy of protecting competition is at least as strongly implicated when ... product designs or configurations are claimed as trade dress. While trademarking a generic term would create a monopoly in a necessary word or phrase, granting trade dress protection to an ordinary product design would create a monopoly in the goods themselves. For this reason, courts have exercised particular "caution" when extending protection to product designs.

*Landscape Forms,* 113 F.3d at 380 (quoting *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 32 (2d Cir. 1995)). Thus, "trade dress protection for product design ... entails a greater risk of impinging on ideas as compared with pro-

tection of packaging or labeling." *Yurman,* 262 F.3d at 101.

Judicial reluctance to extend trade dress protection to entire product lines is also motivated by this fear of enabling monopolistic behavior:

> *Jeffrey Milstein* also demonstrates that a trade dress plaintiff seeking to protect a series or line of products faces the particularly difficult challenge of showing that the appearance of its several products is sufficiently distinct and unique to merit protection as a recognizable trade dress. Furthermore, a claim of trade dress covering an array of items is likely to be broader than one for an individual product's design. Accordingly, when protection is sought for an entire line of products, our concern for protecting competition is acute.

*Landscape Forms,* 113 F.3d at 380 (citations omitted).

With this context in mind, we now consider the sufficiency of plaintiff's pleading. In its Complaint, plaintiff offered a vague description of its claimed trade dress and appended, as separate exhibits, promotional materials for some of its lighting fixtures and photos of defendants' showroom. Compl. ¶ 26; Compl. Exs. C and D. Specifically, Exhibit C of the Complaint consists of (1) brochures that depict eleven separate light fixtures, and (2) photos of defendants' showroom that allegedly depict clones of six of the eleven fixtures from the brochures. Exhibit D of the Complaint consists of specification sheets for ten different *series* of light fixtures. These specification sheets are related to the brochures in Exhibit C in that ten of the eleven fixtures depicted in the Exhibit C brochures are versions of the ten series of light fixtures from Exhibit D.

Given that plaintiff's Complaint did not state with any degree of specificity what plaintiff was endeavoring to protect via

trade dress law, the Court informed plaintiff on a May 22, 2008 conference call that plaintiff would be permitted to amend its Complaint to correct this deficiency. Plaintiff's Amended Complaint, submitted June 6, 2008, unfortunately did not offer any more clarity on this point. The Amended Complaint added to Exhibit C a one-page brochure depicting a light fixture that had already been included in the Complaint's original brochures. Aside from that change, plaintiff essentially left the textual component of its trade dress description unaltered, except to allege that all the elements of the claimed trade dress were non-functional. Am. Compl. ¶ 26. That textual description now consists of the following:

> National's products' trade dress is visibly different from other manufacturers and consists of the following non-functional elements: the positioning of the fluorescent bulb, the distribution of light from the bulb, the angle at which the metal frame is curved, the placements of screws, the appearance of the inside parts, the lack of visibility of hardware, the method of wiring, the shielding design and shielding width, fixture depth, and the overall color and texture combinations.

*Id.*

This description is a laundry list of the elements that constitute a lighting fixture's design,[4] rather than a description of which of plaintiff's trade dress design elements

are distinctive and how they are distinctive.[5] *See Shevy Custom Wigs, Inc. v. Aggie Wigs,* No. 06 Cv. 1657(JG), 2006 WL 3335008, *5 (E.D.N.Y. Nov. 17, 2006) (granting a motion to dismiss a trade dress claim and stating that "[t]he issue is not just *which* features are distinctive, but also *how* they are distinctive") (emphasis in original).

■ When asked repeatedly at oral argument to describe the scope of the claimed trade dress, plaintiff was unable to identify which of the twelve listed design elements are consistent throughout the entire product line or how specifically the claimed trade dress incorporates those common elements.[6] Even when plaintiff did mention specific design elements, he took the approach of asserting that those design elements were not part of the claimed trade dress: "The perforated metal, we are not claiming that that is the trade dress. We are not claiming the painted metal on the end is the trade dress. It is the entire look of the product ..." Tr. 16:25–17:6. A conclusory reliance on the "entire look of the product" does not fulfill the plaintiff's obligation to offer "a precise expression of the character and scope of the claimed trade dress" under *Sherwood* and *Landscape Forms.*[7]

Plaintiff's trade dress claim is not rescued by the mere attachment of brochures, photographs and specifications to the Amended Complaint. First, courts cannot

---

4. When asked twice at oral argument which elements of a lighting fixture are not included in this twelve-element list, plaintiff was unable to name a one. Tr. 27:1–28:6.

5. Pressed on this point at oral argument, plaintiff offered two additional allegedly non-functional elements—that the fixtures were both mitered and welded to avoid light loss—though he conceded that he didn't know whether other manufacturers used these features as well. Tr. 35:22–36:17.

6. Claiming a trade dress with "fixture depth," Am. Compl. ¶ 26, does not provide a meaningful constraint on the scope of the trade dress, while claiming a product line trade dress with fixture depths of 3.2 to 3.9 inches would.

7. Ambiguity as to the scope of a claimed trade dress is particularly problematic when, as here, plaintiff is asking the court to craft an injunction that will prevent the defendant from "[f]urther infringing National's trade dress." Am. Compl. "Demand for Relief" section A.5.

be expected to distill from a set of images those elements that are common to a line of products and both distinctive and non-functional. Second, nowhere in its Amended Complaint and at no point during oral argument did counsel inform the Court which actual designs were encompassed in its trade dress claim. Is plaintiff seeking solely to protect the eleven actual lighting fixtures pictured in the brochures from Exhibit C? Or is plaintiff seeking trade dress protection for each permutation of the ten different series described in the specifications from Exhibit D—in a sense, ten different product lines? If the latter, why does plaintiff include and mark an eleventh fixture in Exhibit C even though that fixture is not a member of any of the ten series listed in Exhibit D?

Because plaintiff has had multiple opportunities to offer "a precise expression of the character and scope of the claimed trade dress" but has not succeeded in doing so, its trade dress infringement claim is dismissed with prejudice as to all defendants.

## II. False Designation of Origin

■ Defendants argue that plaintiff has not stated a claim for false designation of origin under section 43(a) of the Lanham Act. Memorandum of Law in Support of Bridge Metal Industries, LLC's Motion to Dismiss ("Bridge Memo.") at 5; Memorandum of Law of Galaxy Switchgear Industries, Inc. et al. in Support of Their Motion to Dismiss ("Galaxy Memo.") at 11. For the reasons that follow, we dismiss plaintiff's false designation of origin claim with prejudice as to all defendants.

■ To plead a claim for false designation of origin under Section 43(a) of the Lanham Act, a plaintiff must allege that (1) "its product is protectable" and (2) that the defendant's product creates "a likelihood of consumer confusion." *Oakley, Inc. v. Int'l Tropic–Cal, Inc.*, 923 F.2d 167 (Fed.Cir.1991). We need not reach the question of whether plaintiff has adequately pled protectability [8] because we find that it has not adequately pled facts that would support the existence of a "likelihood of consumer confusion."

The Second Circuit has defined a "likelihood of consumer confusion" to be a "likelihood that an appreciable number of ordinarily prudent purchasers [will] be misled, or indeed confused, as to the source of the goods in question." *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978) (quoted in *Thompson Medical Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 213 (2d Cir.1985)). In the instant case, National does not allege that defendants attempted to conceal or lie about the origin of the goods they were selling. On the contrary, plaintiff asserts that defendant Lemberg was "telling the potential clientele he was manufacturing for National but could manufacture fixtures just like National's for a less expensive price." Am. Compl. 40. Thus, the defendants were correctly telling customers that the defendants would be the manufacturer of the lighting fixtures they sold from the showroom. This conduct does not state a claim for false designation of origin under Section 43(a) of the Lanham Act because there was no alleged misrepresentation as

---

**8.** To be "protectable," a product's trade dress must be primarily nonfunctional and must either possess secondary meaning or be inherently distinctive. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 767, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *Oakley*, 923 F.2d at 170 f. 1. We do not reach the question

of whether, to be properly pled, a false designation of origin claim must—like a trade dress infringement claim—include "a precise expression of the character and scope of the claimed trade dress." *Yurman*, 262 F.3d at 115–16.

to the origin of the goods defendants were selling.

### III. Reverse Palming Off

■ Defendants also argue that plaintiff has not stated a claim for reverse palming off under section 43(a) of the Lanham Act. Bridge Memo. at 6; Galaxy Memo. at 11. For the reasons that follow, we dismiss this claim with prejudice as to all defendants.

■ To state a claim for reverse palming off, a plaintiff must allege: "(1) that the [product] at issue originated with the plaintiff; (2) that origin of the work was falsely designated by the defendant; (3) that the false designation of origin was likely to cause consumer confusion; and (4) that the plaintiff was harmed by the defendant's false designation of origin." *Societe Des Hotels Meridien v. LaSalle Hotel Operating P'ship, L.P.*, 380 F.3d 126, 131 (2d Cir.2004) (internal quotation marks omitted) (quoting *Softel, Inc. v. Dragon Medical and Scientific Commc'n, Inc.*, 118 F.3d 955, 970 (2d Cir.1997)).

National argues that it has properly alleged that the fixtures defendants sold "originated with the plaintiff" because products can be said to "originate with the plaintiff" when a defendant uses a plaintiff's confidential information to manufacture those products. Plaintiff's Memorandum of Law in Opposition to All Defendants' Motions to Dismiss ("Pl.'s Memo.") at 12. Yet, as defendants correctly point out, National's argument flies in the face of the Supreme Court's recent holding in *Dastar Corp. v. Twentieth Century Fox Film Corp.*, which states that "reading the phrase 'origin of goods' in the Lanham Act in accordance with the Act's common-law foundations . . . we con-

clude that the phrase refers to the producer of the tangible goods that are offered for sale, and not to the author of any idea, concept, or communication embodied in those goods." 539 U.S. 23, 37, 123 S.Ct. 2041, 156 L.Ed.2d 18 (2003); Bridge Memo. at 6.

Here, National alleges that the products that defendants were and are selling at the showroom were manufactured by the defendants, *not* by the plaintiff. Am. Compl. ¶ 21 ("Defendants continue to act in concert to manufacture, market and sell fixtures using the designs the Bridge Defendants misappropriated from National . . ."). Because National alleges facts that make the defendants the "producer of the tangible goods" under *Dastar*, plaintiffs have not properly alleged that the light fixtures "originated with the plaintiff" and the claim therefore fails.[9]

■ Plaintiff's federal reverse palming off claim fails for another, independently sufficient, reason. As explained in Discussion Section II, *supra*, even if the alleged behavior of defendants is in fact true, such behavior does not constitute a false designation of origin, which is a required element of a reverse palming off claim under the Lanham Act.

### IV. False Advertising and Labeling

■ Defendants argue that National has not stated a claim for false advertising and labeling under section 43(a) of the Lanham Act. Bridge Memo. at 7; Galaxy Memo. at 13. For the reasons that follow, we dismiss this claim with prejudice as to all defendants.

■ To state a claim for false advertising under the Lanham Act, plaintiff

---

9. Even if plaintiff were to argue—and it hasn't—that it was the "producer of the tangible goods" under *Dastar* because the manufacturing defendants acted as agents for plain-tiff, this argument would fail because plaintiff has not alleged that defendants were in fact agents of plaintiff.

must allege either that "the advertising is literally false as a factual matter" or that "although the advertisement is literally true, it is likely to deceive or confuse customers." *Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir.1995) (citing *McNeil–PCC, Inc. v. Bristol–Myers Squibb Co.*, 938 F.2d 1544 (2d Cir.1991)). In the Second Circuit, plaintiff must also allege that "defendants misrepresented an inherent quality or characteristic of the product." *Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841 (2d Cir.1997) (citations and internal quotations omitted).

Defendants argue that plaintiff has not met this burden because "the Amended Complaint is utterly devoid of any allegation concerning any 'false advertisements' or false statements of any kind made by any of the Moving Defendants." Galaxy Memo. at 14. Defendants further argue that "it is impossible to tell from the Amended Complaint what alleged statements the false advertising claim is predicated upon, let alone what 'inherent quality or characteristic of the product' ... was allegedly misrepresented by Defendants. *Id.*

National responds by arguing that it "need not allege a literally false advertisement" but instead merely a statement that is likely to "mislead or confuse customers." Pl.'s Memo. at 15. To show that it has met its pleading burden, National relies on a single statement from the Amended Complaint in which it alleges that defendant Lemberg told "potential clientele he was manufacturing for National but could manufacture fixtures just like National's for a less expensive price." Am. Compl. ¶ 40; Pl.'s Memo at 15.

Yet there is no indication that this statement would mislead or confuse customers. First, nowhere has National claimed that this statement was false. Second, the statement is entirely consistent with National's other allegations: that defendants

were "using the Confidential Information without National's permission to manufacture, market, and sell products apparently identical to National's," that defendants were manufacturing "virtual clones of the National product line" and that defendants were manufacturing "these additional National lighting fixtures" from "the same molds, tools, dies, photographs, drawings, specifications, photometrics, technical know how and other intellectual property imparted to them by National." Am. Compl. ¶¶ 38, 39; Pl.'s Supp. Sub. ¶ 23.

Thus, rather than misleading or confusing customers, Lemberg was allegedly telling them precisely what the sales arrangement was: his firm was manufacturing for National but was willing to sell some of those fixtures directly to customers for a discount. Nor was Lemberg misleading customers about the quality of the product, for he was allegedly selling the same fixtures to them that he was manufacturing for National. While National might well be able to show that this conduct violates the Confidentiality Agreement, it has failed to state a claim for false advertising under the Lanham Act.

## V. Unfair Competition

In its fifth cause of action, plaintiff alleges that every defendant has engaged in unfair competition in violation of section 43(a) of the Lanham Act. Am. Compl. ¶ 68. At oral argument plaintiff conceded that this claim did not have independent force. Tr. 43:14–44:7. Accordingly, because plaintiff's first four Lanham Act claims are dismissed, so too is this claim.

### NEW YORK BUSINESS CORPORATION LAW § 1312

Defendants argue that, if none of plaintiff's federal claims survive the motion to dismiss, plaintiff is barred from maintain-

ing this action by New York's "Door–Closing" statute, N.Y. B.C.L. § 1312. Bridge Memo. at 18; Galaxy Memo. at 23. Section 1312(a) states in relevant part:

> A foreign corporation doing business in this state without authority shall not maintain any action or special proceeding in this state unless and until such corporation has been authorized to do business in this state and it has paid to the state all fees and taxes imposed under the tax law or any related statute ... as well as penalties and interest charges related thereto, accrued against the corporation.

 "Section 1312 ... was passed to ensure that those foreign companies that engaged in systematic intrastate transactions in New York undertook to conform to registration and taxation requirements before taking advantage of the state's courts as a forum for its grievances ..." *Commodity Ocean Transp. Corp. of N.Y. v. Royce*, N.Y.L.J., Aug. 31, 1993, at 26 (West.Co., Aug. 30, 1993)(internal quotation omitted). Section 1312(a) bars unauthorized foreign corporations both from pursuing suits in New York state courts and from pursuing diversity actions in the federal courts of New York. *Netherlands Shipmortgage Corp., Ltd. v. Madias*, 717 F.2d 731 (2d Cir.1983).

In this case, the parties dispute whether plaintiff is in fact a "foreign corporation doing business in this state without authority" under section 1312(a). To resolve this issue a hearing (preceded by discovery) would be necessary. It is unclear whether, at this juncture, plaintiff would decide to proceed to such a hearing given the business consequences of a determination that it is "doing business in this state without authority." Plaintiff might instead prefer to pursue this matter in the courts of New Jersey. Without resolution of plaintiff's corporate status we are in no position to address the viability of any of plaintiff's state claims. Accordingly, they are dismissed without prejudice subject to reconsideration if plaintiff decides to proceed in this forum and it is determined after a hearing that plaintiff is not "doing business in this state without authority" or, if it is, that plaintiff brings itself into compliance with the requirements of section 1312(a).

### CONCLUSION

For the reasons set forth above, plaintiff's five federal claims are dismissed with prejudice as to all defendants. Plaintiffs nine state law claims are dismissed without prejudice. Plaintiff is directed to inform this Court by March 25, 2009 of its proposed course of action.

**IT IS SO ORDERED.**